# 13 MISC 00110

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

In re Application of KREKE IMMOBILIEN KG, Petitioner,

To Issue a Subpoena to Deutsche Bank AG, for Production of Documents and Testimony for Use in a Foreign Proceeding

Civil No.:

RECEIVED
MAR 27 2013
U.S.D.C. S.D. N.Y.
CASHIERS

## APPLICATION FOR DISCOVERY IN AID OF A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. §1782

1.    Petitioner Kreke Immobilien KG ("Kreke Im.") applies to this Court for an Order pursuant to 28 U.S.C. § 1782 authorizing its attorneys to issue and serve subpoenas in accordance with Federal Rule of Civil Procedure 45 upon Deutsche Bank AG ("Deutsche Bank"). As explained below and in its accompanying Memorandum, Kreke Im. is seeking documents and testimony from Deutsche Bank for use in a legal proceeding pending in Germany against Deutsche Bank's wholly-owned subsidiary, Sal. Oppenheim jr. & Cie. AG & Co. KGaA ("Oppenheim"). Kreke Im. is about to commence suit against Oppenheim and others in connection with Kreke Im.'s net investment of almost €30 million in real-estate investment funds fraudulently marketed by Oppenheim and managed by an Oppenheim partnership in breach of that partnership's and Oppenheim's duties to Kreke Im.[1]

---

[1]    Kreke Im. demanded mediation of its claims pursuant to an Application for Conciliation dated 29 December 2011, attached as Exhibit 1 to the Declaration of Stefan Kraus. That mediation was scheduled in Hamburg, Germany on January 10, 2013. Oppenheim and the other respondents refused to attend the mediation, and the case was not settled. The mediation tolled the statute of limitations at least until May 2013. Kreke Im. will commence litigation prior to that date to avoid a possible statute of limitations bar.

## FACTUAL BACKGROUND

2.      Petitioner Kreke Im. is a German limited partnership formed to manage assets of the Kreke family.  The objective of the Kreke partnership is to make conservative real-estate investments and obtain returns in the form of rental and lease income. Dr. Henning Kreke and Dr. Jörn Kreke, both German citizens, function as the personally-liable partners of Kreke Im.  Kreke Im.'s limited partners (Kommanditisten) include the children of Dr. Henning Kreke and his wife, Jane, an American citizen.  Each of their children—Katharina Suzanne, Anna Karolin, Christopher Austin, and Katelyn Michelle Kreke—has U.S. citizenship.

3.      Oppenheim is a leading German private bank, and has been operating since 1789. Its focus is asset management for private clients with high net worth, institutional clients, and investment funds, including real-estate investment funds.

4.      Commencing in the 1990's, Oppenheim began to promote real estate investments in various funds collectively known as the Oppenheim-Esch funds.  The Oppenheim-Esch funds generally were formed to purchase sites, develop or redevelop real estate on the sites, and subsequently to manage the real estate project.  In total there were about 42 separate Oppenheim-Esch funds, into which investors made or committed to make investments of more than €4 billion.  Oppenheim profited handsomely from these funds because the funds paid grossly-excessive fees throughout the whole development process to businesses controlled by Josef Esch and Oppenheim, either directly or indirectly through a partnership in which both had a fifty percent interest.

5.      In March 2010, Deutsche Bank acquired Oppenheim for €1 billion, and Oppenheim became a wholly-owned subsidiary of Deutsche Bank.

6.      Deutsche Bank is a German bank that maintains a significant presence in New York through its U.S. headquarters, located at 60 Wall Street.  Although its official headquarters remains in Frankfurt am Main, Germany, major corporate departments have long since been

established in New York. In particular, its General Counsel, Mr. Richard Walker, is based in New York. Deutsche Bank claims to be one of the largest foreign-based employers in New York City, and to have over 11,000 U.S. employees. Deutsche Bank conducts systematic and continuous business activities in New York.

7.     In the course of the due diligence associated with its possible acquisition of Oppenheim, Deutsche Bank obtained and reviewed files relevant to the investments at issue in Kreke Im.'s lawsuit against Oppenheim. Representatives of Deutsche Bank also met and interviewed senior management of Oppenheim about the investment transactions undertaken by Kreke Im. and others in the Oppenheim-Esch funds. In addition, after acquiring Oppenheim as a wholly-owned subsidiary, Deutsche Bank consolidated the operations of Oppenheim into the business operations of Deutsche Bank and now has control of the documents possessed by Oppenheim.

8.     Prior to Deutsche Bank's acquisition of Oppenheim, Oppenheim successfully solicited Kreke Im.'s investment in three closed-end real-estate investment funds. An Oppenheim partner, Mr. Detlef Bierbaum, knew Dr. Jörn Kreke from their service together on the board of Douglas Holding AG. Mr. Bierbaum advised Dr. Jörn Kreke of investment opportunities in Oppenheim-Esch real-estate funds.

9.     Oppenheim's sales strategy to Kreke Im. emphasized that the Oppenheim-Esch funds were primarily designed for the personal investment purposes of Oppenheim partners and the families of its shareholders. According to Oppenheim and Mr. Bierbaum, it was only for tax reasons that a small portion of the Oppenheim-Esch funds were opened up to external investors. In other words, the funds were pitched as special investment products purportedly being offered to a select number of hand-picked clients of the bank. These representations proved to be materially false, as the funds were primarily marketed to and funded by Oppenheim's high net worth investment clients, with Oppenheim reaping excess profits through its fifty-percent interest

in the partnership with Josef Esch, which controlled the service providers charging high fees to the real-estate funds.

10.     Oppenheim claimed that the underlying real-estate investments would consist solely of high-quality properties leased to long-term tenants with impeccable credit ratings. According to Oppenheim, this meant that any investment would be particularly safe. The investment strategy and risk profile described by Mr. Bierbaum and Oppenheim matched the conservative investment goals of Kreke Im. These representations also proved to be materially false.

11.     Oppenheim sent Dr. Jörn Kreke documents for three different Oppenheim-Esch real-estate funds, emphasizing each time that the investments were being offered only to partners at the bank, its shareholders, and its closest clients. Kreke Im. eventually made the following capital contribution commitments to three such Oppenheim-Esch real-estate funds invested in commercial real estate projects, beginning in the years indicated:

| A. | Köln-Ossendorf V GbR Fund (2000): | €6,451,075 |
| B. | Potsdam Brandenburger Straße GbR Fund 2001): | €5,711,937 |
| C. | Bürohäuser Köln Rheinhallen GbR Fund (2002): | €17,708,550 |
| | Total: | €29,871,562 |

12.     In accordance with Oppenheim's investment model, Kreke Im.'s investments were significantly leveraged and its capital commitments initially financed by Oppenheim during the construction phase and at a later stage partially refinanced by other banks, including Sparkasse KölnBonn, the Cologne municipal savings bank. Kreke Im. has also received certain distributions over time. When the distributions are subtracted from Kreke Im.'s equity and interest payments made to date, Kreke Im. has paid approximately €8.1 million to date, and has massive outstanding loan commitments.

13.     Kreke Im. eventually came to learn that the Oppenheim-Esch real-estate funds were fraudulently marketed. They have fees that result in an exorbitant cost structure and that are often not justified economically. The Oppenheim-Esch funds represented that rents were significantly higher than they really were because the tenants received undisclosed payments or allowances, and because rental areas were computed incorrectly. In addition, there were undisclosed self-dealing transactions between Oppenheim- and Esch-controlled entities, including kickback schemes.

14.     For example, "soft costs" charged to investors (e.g., servicing fees not related to the cost of the property or construction) in the Oppenheim-Esch real-estate funds amount to 30-40% of the total investments in the funds. These fees far exceed market rates. Oppenheim failed to disclose that many of these costs were above market rates and not economically justified.

15.     One of the reasons the soft costs reached such exorbitant levels was because Oppenheim and Esch falsely inflated those costs. For example, fund investors were charged considerable commissions for first-time leasing even when fund projects were planned from the outset for tenants that had already committed, so no first-time leasing fee should have been required. Fund investors were likewise charged fees for finance sourcing when finance partners were already available.

16.     In addition, the services for which the funds were charged were invariably provided by Oppenheim- or Esch-controlled entities. Those entities then routed the fees to an Oppenheim-Esch partnership so that the bank, which was promoting and financing the investors, received half the fees.

17.     The fees paid to Oppenheim from the Oppenheim-Esch partnership were so great that in some years they amounted to half the bank's profits.

18.     In order to attract investors, Oppenheim also falsely represented or failed to disclose material facts concerning tenants and lease rates. Oppenheim represented that the

underlying real estate was already leased to reputable tenants under long-term leases with conditions that appeared to make the investment profitable in the projections Oppenheim presented to the investors, including Kreke Im. In order for these projections to show a profit, above-market rents were charged to the first tenants, creating an impression that it would be possible to maintain such rents even after the initial lease terms had expired.

19.     Those initial above-market rents, however, were made possible by an improper scheme Oppenheim and Esch implemented with the first tenants. In short, Oppenheim and Esch used straw-man first tenants who agreed to above-market rents in exchange for kickbacks. Sparkasse KölnBonn, managed at the time by Gustav Adolf Schröder, was often a partner in these schemes, acting as de facto co-initiator and as interim tenant or rent guarantor for numerous Oppenheim-Esch fund properties.

20.     Oppenheim further inflated its projections by inflating and misrepresenting the floor space used as a basis for calculating rents. Oppenheim would disclose to its investors, including Kreke Im., *gross* floor space, i.e., areas that included all internal walls, supply shafts and public roadways. The gross floor space was often 15 to 20% larger than the actual rentable space. Oppenheim did not disclose this non-standard calculation method, which served to further ensure that projected earnings did not match the market rates likely to be paid for the actual rentable space.

21.     As a result of Oppenheim's fraudulent scheme, the Oppenheim-Esch funds in which Kreke Im. has invested have present values far less—from 35-70% less—than the amounts Oppenheim raised from investors like Kreke Im.

## PROCEEDINGS IN GERMANY

22.     Kreke Im. commenced a formal mediation against Oppenheim in Germany on December 26, 2011, which terminated on January 10, 2013, without resolution.

23.    Kreke Im. is in the process of commencing suit against Oppenheim and others in the District Court (Landgericht) of Cologne.  Kreke Im. will assert claims for fraud, breach of duty, and breach of contract based on the facts set forth above.

## THE REQUIREMENTS OF SECTION 1782 ARE SATISFIED

24.    This application satisfies the statutory requirements of Section 1782, which provides in relevant part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782.

25.    To obtain discovery in aid of a foreign proceeding, a petitioner is required to show only that (1) the person from whom discovery is requested resides or is found in the district where the application is made; (2) the information sought is for use in a foreign proceeding; and (3) the petitioner is an interested person in that proceeding.   There are also discretionary factors set forth by the United States Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) that courts are advised to consider.

26.    All three necessary requirements are met here.  First, Deutsche Bank AG does continuous and systematic investment banking business in New York City, where it maintains offices on Wall Street and is regularly a litigant in this District.  Its website boasts that it "is the only investment bank physically located on Wall Street and one of the largest foreign-based employers in New York City."

27.    Second, the limited information Kreke Im. seeks is for use in the civil lawsuit it is filing in Cologne, Germany, which constitutes a proceeding in a foreign tribunal.

28.    Third, the application is made by an interested person; Kreke Im. will be the plaintiff in a German proceeding that is imminent.

7

29.    Finally, for the reasons set forth in its accompanying Memorandum, *Intel Corp.*'s discretionary factors also favor granting this application.

30.    For the reasons set forth above and in its accompanying Memorandum, Kreke Im. respectfully requests that it be authorized to serve on Deutsche Bank the discovery attached as Exhibits A and B to this Application.

Dated:   March 26, 2013                          Respectfully submitted,

                                                 FAEGRE BAKER DANIELS LLP

                                                 Leif T. Simonson (LS-5915)
                                                 2200 Wells Fargo Center
                                                 90 South Seventh Street
                                                 Minneapolis, MN  55402-3901
                                                 Telephone:  (612) 766-7000
                                                 *Leif.simonson@faegrebd.com*

                                                 *Attorneys for Petitioner Kreke Immobilien KG*

dms.us.51748748.02

# EXHIBIT A

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
## For The
## SOUTHERN DISTRICT of NEW YORK

| | |
|---|---|
| **Kreke Immobilien, KG,**<br>For an Order to Conduct Discovery<br>for Use in Foreign Proceedings<br>*Petitioner*<br><br>Seeking Discovery from<br><br>**Deutsche Bank**<br>*Respondent* | )<br>)<br>)<br>)<br>)<br>)    Civil Action No.<br>)<br>)<br>)<br>) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION
## FOR USE IN A FOREIGN PROCEEDING

To: Deutsche Bank, 60 Wall Street, New York, NY 10005

___X___ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

___**SEE ATTACHMENT A**___

| Place: | Date and Time: |
|---|---|
| **TSG Reporting**<br>747 Third Ave., NYC, NY 10017 | **April 25, 9:30 a.m.,** or such time as<br>mutually agreed upon by counsel |

The deposition will be recorded by this method: ___Stenographic and/or videorecording.___

_____ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:

| *CLERK OF COURT* | OR | *Leif Simonson* |
|---|---|---|
| _____<br>Signature of Clerk or Deputy Clerk | | _____<br>Attorney's signature |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* **Kreke Immobilien KG,** who issues or requests this subpoena are: Leif Simonson, 90 S. Seventh Street, Minneapolis MN 55402, leif.simonson@faegrebd.com, 612-766-7000

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ **!D21 Is Not In Table**

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 88A  (Rev.  06/09) Subpoena to Testify at a Deposition in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## ATTACHMENT A

### DEFINITIONS

1. The phrase "POSSESSION, CARE, CUSTODY OR CONTROL" shall mean possession, care, custody or control, including constructive possession, such that the respondent need not have actual physical possession of the DOCUMENT or thing, so long as the respondent has a right or ability in practice to compel the production from a third party entity (including an agency, subsidiary, division, authority, or service provider) having physical possession of the item.

2. As used herein, the term "OPPENHEIM" shall mean and refer to Sal. Oppenheim jr & Cie. AG & Co. KGaA, including Oppenheim's members, officers, partners, directors, contractors, employees, servants, representatives, legal predecessors, agents, subsidiaries (in particular the Oppenheim-Esch Holding GbR and its subsidiaries), affiliates, consultants, attorneys, accountants, investigators, assigns, or any other person or entity acting, or purporting to act, on Oppenheim's behalf, either directly or indirectly.

3. As used herein, the term "DEUTSCHE BANK" shall mean and refer to Deutsche Bank AG, including Deutsche Bank's members, officers, partners, directors, contractors, employees, servants, representatives, agents, subsidiaries, affiliates, consultants, attorneys, accountants, investigators, assigns, or any other person or entity acting, or purporting to act, on Deutsche Bank's behalf, either directly or indirectly.

4. As used herein, the term "ESCH" shall mean and refer to Josef Esch, with business address Christian-Esch-Str. 2-4, 53844 Troisdorf, Germany, or any and all companies, firms, partnerships, or business entities owned by, controlled by, or affiliated with him.

5. As used herein, the term "OPPENHEIM-ESCH FUNDS" shall mean and refer to any and all German real-estate investment funds formed, financed, organized, managed, serviced or promoted, in whole or in part, by a combination of Oppenheim and Esch.

6. As used herein, the term "KREKE IM." shall mean and refer to Kreke Immobilien, KG, or its partnership members, Dr. Henning Kreke and Dr. Jörn Kreke.

## FEDERAL RULE 30(b)(6) DEPOSITION TOPICS

1.  The creation, promotion, offering for sale, sale, management or operation of any of the Oppenheim-Esch funds, including but not limited to the Köln-Ossendorf V GbR Fund, Potsdam Brandenburger Straße GbR Fund, and the Bürohäuser Köln Rheinhallen GbR Fund, from 2000 to the present, and Deutsche Bank's possession, care, custody or control of documents or communications relating to same.

2.  Deutsche Bank's analysis of any claims against, government investigations into, or prosecutions of Sal. Oppenheim or its directors, officers, employees or partners regarding the Oppenheim-Esch funds, and Deutsche Bank's possession, care, custody or control of documents or communications relating to same.

3.  Oppenheim's communication with and solicitation of investors or possible investors for the Oppenheim-Esch funds, including but not limited to its meetings or communications with Kreke Im. or any individual associated with Kreke Im., and Deutsche Bank's possession, care, custody or control of documents or communications relating to same.

4.  Oppenheim's selection of potential investors in the Oppenheim-Esch funds and Deutsche Bank's possession, care, custody or control of documents or communications relating to same.

5.      Any internal analysis conducted by or for Sal. Oppenheim of costs, fees, profits, or performance of the Oppenheim-Esch funds (including but not limited to revenue from tenants, expenses for engineering and construction of buildings, and any remuneration owed to main contractors by Esch), and Deutsche Bank's possession, care, custody or control of documents or communications relating to same.

6.      Risk disclosures made to investors in the Oppenheim-Esch funds, and Deutsche Bank's possession, care, custody or control of documents or communications relating to same.

7.      Fees or other compensation received by Oppenheim in connection with the Oppenheim-Esch funds and Deutsche Bank's possession, care, custody or control of documents or communications relating to same.

8.      Deutsche Bank's possession, care, custody or control of documents in the actual physical data room made available to Deutsche Bank, in connection with its acquisition of Sal. Oppenheim, relating to the Oppenheim-Esch funds.

9.      Deutsche Bank's possession, care, custody or control of documents in the "virtual data room" made available to Deutsche Bank, in connection with its acquisition of Sal. Oppenheim, relating to the Oppenheim-Esch funds.

10.     Any report received by Deutsche Bank or Sal. Oppenheim from PriceWaterhouseCoopers, Ernst & Young, or any other accounting firm regarding the Oppenheim-Esch funds, and Deutsche Bank's possession, care, custody or control of documents or communications relating to any such report.

11.     Any report from German banking regulators, including the Federal Financial Supervisory Authority (known as BaFin) regarding any aspect of the Oppenheim-Esch funds,

and Deutsche Bank's possession, care, custody or control of documents or communications relating to any such German banking regulatory agency report.

12.     Any dealings between Sal. Oppenheim and Josef Esch or any entity owned or controlled in whole or in part by Mr. Esch, relating to the creation, financing, management, or operation of the Köln-Ossendorf V GbR Fund, Potsdam Brandenburger Straße GbR Fund, and the Bürohäuser Köln Rheinhallen GbR Fund, from 2000 to the present, and Deutsche Bank's possession, care, custody or control of documents or communications relating to such dealings.

13.     Any report or draft report prepared by the Freshfields law firm analyzing the Oppenheim-Esch funds and all documents reviewed in connection with such report or draft report, and Deutsche Bank's possession, care, custody or control of documents or communications relating to such report or draft report.

14.     Compensation by any Oppenheim or Esch-related entity to tenants in any Oppenheim-Esch funds project, and Deutsche Bank's possession, care, custody or control of documents or communications relating to any such compensation.

15.     Oppenheim's selection and solicitation of tenants for Oppenheim-Esch Fund projects, and Deutsche Bank's possession, care, custody or control of documents or communications relating to such selection and solicitation.

16.     Any notes, minutes, reports, or other records, written or otherwise, of due diligence meetings or other meetings between Deutsche Bank and Oppenheim regarding the Oppenheim-Esch funds, and Deutsche Bank's possession, care, custody or control of documents or communications relating to such meetings regarding the Oppenheim-Esch funds.

# EXHIBIT B

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of New York

| | |
|---|---|
| Kreke Immobilien, KG | ) |
| _Petitioner_ | ) For an Order to |
| | ) Conduct Discovery for |
| | ) Use in a Foreign |
| | ) Proceeding |
| | ) |
| | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## IN A CIVIL ACTION FOR USE IN A FOREIGN PROCEEDING

To:   Deutsche Bank AG, 60 Wall Street, New York, NY

☒ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

SEE ATTACHED EXHIBIT A

| Place:   TSG Reporting<br>747 Third Ave.<br>NYC, NY 10017 | Date and Time:<br>Within 30 days of the date of service. |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:   _____, 2013

CLERK OF COURT

_____          OR          _____
_Signature of Clerk or Deputy Clerk_                                  _Attorney's signature_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_          Kreke Immobilien KG
_____, who issues or requests this subpoena, are:

Lief T. Simonson, FAEGRE BAKER DANIELS LLP,
2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402
Telephone: 612-766-7225; email: Robert.Schnell@faegrebd.com

AO 88B  (Rev.  06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____

I declare under penalty of perjury that this information is true.

Date: _____                    _____

                                              *Server's signature*

                                         _____

                                              *Printed name and title*

                                         _____

                                              *Server's address*

Additional information regarding attempted service, etc:

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## EXHIBIT A

## DOCUMENTS TO BE PRODUCED

## DEFINITIONS

1. "And" includes the word "or" and vice-versa.

2. "Any" includes the word "all" and vice-versa.

3. As used herein, the terms "DOCUMENT" or "DOCUMENTS" shall include, without limitation and to the broadest extent permissible by Federal Rule of Civil Procedure 34, all COMMUNICATIONS in a tangible form, however produced, reproduced, or stored on any electronic media, and shall include, but not be limited to, the following: all records, memoranda, reports, financial statements, handwritten and other notes, transcripts, papers, indices, letters, envelopes, telegrams, cables, telex messages, tabulations, work papers, timesheets, statements, summaries, opinions, journals, desk calendars, appointment books, diaries, magazines, newspapers, booklets, circulars, bulletins, notices, instructions, manuals, notes or summaries of telephone conversations or messages or other COMMUNICATIONS of any type, video recording, photographs, tape or other recordings, punch cards, discs, data cells, drums, printouts, and other data compilations from which information can be obtained, electronically-stored information, correspondence, teletype messages, electronic mail, instant messages, internal memoranda, agreements, diary entries, minute books, financial records, accounting records, income tax returns, ledgers, journals, audits, receipts, canceled checks, check stubs, drafts and other written, deeds, leases, mortgages, assignments, insurance policies, or other instruments related to real or personal property printed or typed matter, diagrams, plans, pictures, travel, entertainment, or expense records or reports or any other tangible thing that constitutes matter. The term "DOCUMENT" and "DOCUMENTS" shall also mean originals and exact copies or reproductions of all such written, printed, typed, recorded or graphic material or matter upon

which notations or markings in writing, print or otherwise have been made which do not appear in the originals.

4.     The term "COMMUNICATION(S)" shall mean the transmittal of any information by any method and includes all meetings, discussions, telephone conversations, contracts, letters, e-mails, memoranda, correspondence, reports, statements, consultations, negotiations, estimates, purchase orders and any DOCUMENT relating thereto.

5.     The phrase "RELATED TO" or "RELATING TO" shall mean in relation to, related to, consisting of, referring to, reflecting, concerning, containing, embodying, identifying, dealing with, mentioning, defining, explaining, monitoring, modifying, quoting, criticizing, describing, creating or maintaining, bearing upon, constituting a basis for, deriving from or arising from, discussing, evidencing, commenting on, supporting, contradicting or having any logical or factual connection with the matter identified, in whole or in part.

6.     The phrase "POSSESSION, CARE, CUSTODY OR CONTROL" shall mean possession, care, custody or control, including constructive possession, such that the respondent need not have actual physical possession of the DOCUMENT or thing, so long as the respondent has a right or ability in practice to compel the production from a third party entity (including an agency, subsidiary, division, authority, or service provider) having physical possession of the item.

7.     The term "PERSON" shall mean any individual, corporation, organization, association, partnership, enterprise, limited partnership, limited liability company, firm, joint venture, trustee, governmental body, agency, governing board, department or division, or any other entity.

8.   As used herein, the term "OPPENHEIM" shall mean and refer to Sal. Oppenheim jr & Cie. AG & Co. KGaA, including Oppenheim's members, officers, partners, directors, contractors, employees, servants, representatives, legal predecessors, agents, subsidiaries (in particular the Oppenheim-Esch Holding GbR and its subsidiaries), affiliates, consultants, attorneys, accountants, investigators, assigns, or any other person or entity acting, or purporting to act, on Oppenheim's behalf, either directly or indirectly.

9.   As used herein, the term "DEUTSCHE BANK" shall mean and refer to Deutsche Bank AG, including Deutsche Bank's members, officers, partners, directors, contractors, employees, servants, representatives, agents, subsidiaries, affiliates, consultants, attorneys, accountants, investigators, assigns, or any other person or entity acting, or purporting to act, on Deutsche Bank's behalf, either directly or indirectly.

10.   As used herein, the term "KREKE" shall mean and refer to Kreke Immobilien, KG, or its partnership members, Dr. Henning Kreke and Dr. Jörn Kreke.

11.   As used herein, the term "ESCH" shall mean and refer to Josef Esch, with business address Christian-Esch-Str. 2-4, 53844 Troisdorf, Germany, or any and all companies, firms, partnerships, or business entities owned by, controlled by, or affiliated with him.

12.   As used herein, the term "OPPENHEIM-ESCH FUNDS" shall mean and refer to any and all German real-estate investment funds formed, financed, organized, managed, serviced or promoted, in whole or in part, by a combination of Oppenheim and Esch.

13.   As used herein, the singular form of a word shall be interpreted to include the plural form and the plural form shall be interpreted to include the singular whenever appropriate in order to bring within the scope of this request any DOCUMENTS which might otherwise be considered to be beyond its scope.

14.    The term "INCLUDING" is used without limitation to items or topics not specifically listed.  "INCLUDING" is intended to illustrate the kind of information responsive to each request herein.  Such examples are not intended to be exhaustive of the information sought and shall not in any way be read to limit the scope of the requests.

## INSTRUCTIONS

The following instructions shall govern the response and production of DOCUMENTS:

1.    Respondent shall furnish all requested documents in Respondent's possession, care, custody, or control at the time of production.

2.    In answering each discovery request, Respondent shall make a diligent search of Respondent's records and other papers and materials in Respondent's possession, custody, or control.

3.    In the event that any DOCUMENT called for by these Document Requests is withheld on the basis of a claim of privilege, that DOCUMENT is to be identified in a privilege log as follows:  author(s); addressee(s); indicated or blind copy recipient(s); date; subject matter; number of pages; attachments or appendices; all persons to whom distributed, shown or explained; the present custodian(s); the nature of the privilege asserted; and the circumstances that give rise to the privilege.

4.    In the event that any DOCUMENT called for by these Document Requests has been destroyed, discarded, otherwise disposed of, or no longer exists, that DOCUMENT is to be identified as completely as possible, including, without limitation, the following information: author(s); addressee(s); indicated or blind copy recipient(s); date; subject matter; date of

disposal; reason for disposal; PERSON authorizing the disposal; the PERSON disposing of the DOCUMENT; and the last known location of the DOCUMENT.

5.      In the event that any information is redacted from a DOCUMENT produced pursuant to these Document Requests, that information is to be identified and the basis upon which such information is redacted should be fully stated.

6.      In the event that multiple copies or versions of a DOCUMENT exist, produce all non-identical copies of the DOCUMENT, including any and all drafts of the DOCUMENT.

7.      All DOCUMENTS existing in electronic form shall be produced in electronic form in a manner to preserve, without alteration or modification, all meta-data associated with the electronic DOCUMENT, including without limitation extracted text.

8.      At the time and place of production of the DOCUMENTS requested herein, the DOCUMENTS requested are to be produced in the same order as maintained in the ordinary course of business.

9.      For each DOCUMENT produced, identify the specific Document Request category to which it is responsive.

10.     As used herein, the singular form of a word shall be interpreted to include the plural form and the plural form shall be interpreted to include the singular whenever appropriate in order to bring within the scope of this request any DOCUMENTS which might otherwise be considered to be beyond its scope.

11.     The Discovery Requests are ongoing.  In the event that any DOCUMENTS or materials come to the Respondent's attention or possession, custody, or control after the filing of Respondent's responses hereto, which DOCUMENTS or materials are within the scope of any

request for production herein, said additional DOCUMENTS or materials shall be furnished to Movant's attorneys.

## DOCUMENTS TO BE PRODUCED BY DEUTSCHE BANK

1. All documents or communications relating to the creation, promotion, offering for sale, sale, management or operation of any of the Oppenheim-Esch funds, including but not limited to the Köln-Ossendorf V GbR Fund, the Potsdam Brandenburger Straße GbR Fund, and the Bürohäuser Köln Rheinhallen GbR Fund.

2. All documents or communications relating to any analysis by or for Deutsche Bank of any claims against, government investigations into, or prosecutions of Sal. Oppenheim or its directors, officers, employees or partners regarding any of the Oppenheim-Esch funds.

3. All documents or communications relating to any meetings or communications with or solicitations of investors or possible investors for any of the Oppenheim-Esch funds, including but not limited to meetings or communications with Kreke Im. or any individual associated with Kreke Im.

4. All documents or communications relating to Oppenheim's selection of potential investors in any of the Oppenheim-Esch funds.

5. All documents or communications relating to any internal analysis, conducted by or for Sal. Oppenheim, of costs, fees, profits, or performance of any of the Oppenheim-Esch funds, including but not limited to revenue from tenants, expenses for engineering and construction of buildings, and any remuneration owed to main contractors by Esch.

6. All documents or communications relating to the risk disclosures made to investors in the Oppenheim-Esch funds.

7. All documents or communications relating to the fees or other compensation received by Sal. Oppenheim in connection with the Oppenheim-Esch funds.

8. All documents in the actual physical data room made available to Deutsche Bank, in connection with its acquisition of Sal. Oppenheim, relating to the Oppenheim-Esch funds.

9. All documents in the "virtual data room" made available to Deutsche Bank, in connection with its acquisition of Sal. Oppenheim, relating to the Oppenheim-Esch funds.

10. Any report received by Deutsche Bank or Oppenheim from PriceWaterhouseCoopers, Ernst & Young, or any other accounting firm regarding the Oppenheim-Esch funds.

11. Any report from German banking regulators, including the Federal Financial Supervisory Authority (known as BaFin) regarding any aspect of the Oppenheim-Esch funds.

12. All documents or communications relating to any dealings between Oppenheim and Josef Esch or any entity owned or controlled in whole or in part by Mr. Esch, relating to the creation, financing, management, or operation of the Köln-Ossendorf V GbR Fund, the Potsdam Brandenburger Straße GbR Fund, and the Bürohäuser Köln Rheinhallen GbR Fund, from 2000 to the present.

13. Any report or draft report prepared by the Freshfields law firm analyzing the Oppenheim-Esch funds and all documents reviewed in connection with such report or draft report.

14. All documents or communications relating to compensation by any Oppenheim or Esch-related entity to tenants in any Oppenheim-Esch funds project.

15. All documents or communications relating to Oppenheim's selection and solicitation of tenants in any Oppenheim-Esch funds project.

16. Any notes, minutes, reports, or other records, written or otherwise, of due diligence meetings or other meetings between Deutsche Bank and Oppenheim regarding the Oppenheim-Esch funds.