# EXHIBIT A

**13MISC 00110**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re Application of KREKE IMMOBILIEN KG, Petitioner,

To Issue a Subpoena to Deutsche Bank AG, for Production of Documents and Testimony for Use in a Foreign Proceeding

Civil No.: _____

---

### APPLICATION FOR DISCOVERY IN AID OF A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782

1.  Petitioner Kreke Immobilien KG ("Kreke Im.") applies to this Court for an Order pursuant to 28 U.S.C. § 1782 authorizing its attorneys to issue and serve subpoenas in accordance with Federal Rule of Civil Procedure 45 upon Deutsche Bank AG ("Deutsche Bank"). As explained below and in its accompanying Memorandum, Kreke Im. is seeking documents and testimony from Deutsche Bank for use in a legal proceeding pending in Germany against Deutsche Bank's wholly-owned subsidiary, Sal. Oppenheim jr. & Cie. AG & Co. KGaA ("Oppenheim"). Kreke Im. is about to commence suit against Oppenheim and others in connection with Kreke Im.'s net investment of almost €30 million in real-estate investment funds fraudulently marketed by Oppenheim and managed by an Oppenheim partnership in breach of that partnership's and Oppenheim's duties to Kreke Im.[1]

---

[1] Kreke Im. demanded mediation of its claims pursuant to an Application for Conciliation dated 29 December 2011, attached as Exhibit 1 to the Declaration of Stefan Kraus. That mediation was scheduled in Hamburg, Germany on January 10, 2013. Oppenheim and the other respondents refused to attend the mediation, and the case was not settled. The mediation tolled the statute of limitations at least until May 2013. Kreke Im. will commence litigation prior to that date to avoid a possible statute of limitations bar.

## FACTUAL BACKGROUND

2. Petitioner Kreke Im. is a German limited partnership formed to manage assets of the Kreke family. The objective of the Kreke partnership is to make conservative real-estate investments and obtain returns in the form of rental and lease income. Dr. Henning Kreke and Dr. Jörn Kreke, both German citizens, function as the personally-liable partners of Kreke Im. Kreke Im.'s limited partners (Kommanditisten) include the children of Dr. Henning Kreke and his wife, Jane, an American citizen. Each of their children—Katharina Suzanne, Anna Karolin, Christopher Austin, and Katelyn Michelle Kreke—has U.S. citizenship.

3. Oppenheim is a leading German private bank, and has been operating since 1789. Its focus is asset management for private clients with high net worth, institutional clients, and investment funds, including real-estate investment funds.

4. Commencing in the 1990's, Oppenheim began to promote real estate investments in various funds collectively known as the Oppenheim-Esch funds. The Oppenheim-Esch funds generally were formed to purchase sites, develop or redevelop real estate on the sites, and subsequently to manage the real estate project. In total there were about 42 separate Oppenheim-Esch funds, into which investors made or committed to make investments of more than €4 billion. Oppenheim profited handsomely from these funds because the funds paid grossly-excessive fees throughout the whole development process to businesses controlled by Josef Esch and Oppenheim, either directly or indirectly through a partnership in which both had a fifty percent interest.

5. In March 2010, Deutsche Bank acquired Oppenheim for €1 billion, and Oppenheim became a wholly-owned subsidiary of Deutsche Bank.

6. Deutsche Bank is a German bank that maintains a significant presence in New York through its U.S. headquarters, located at 60 Wall Street. Although its official headquarters remains in Frankfurt am Main, Germany, major corporate departments have long since been

2

established in New York. In particular, its General Counsel, Mr. Richard Walker, is based in New York. Deutsche Bank claims to be one of the largest foreign-based employers in New York City, and to have over 11,000 U.S. employees. Deutsche Bank conducts systematic and continuous business activities in New York.

7. In the course of the due diligence associated with its possible acquisition of Oppenheim, Deutsche Bank obtained and reviewed files relevant to the investments at issue in Kreke Im.'s lawsuit against Oppenheim. Representatives of Deutsche Bank also met and interviewed senior management of Oppenheim about the investment transactions undertaken by Kreke Im. and others in the Oppenheim-Esch funds. In addition, after acquiring Oppenheim as a wholly-owned subsidiary, Deutsche Bank consolidated the operations of Oppenheim into the business operations of Deutsche Bank and now has control of the documents possessed by Oppenheim.

8. Prior to Deutsche Bank's acquisition of Oppenheim, Oppenheim successfully solicited Kreke Im.'s investment in three closed-end real-estate investment funds. An Oppenheim partner, Mr. Detlef Bierbaum, knew Dr. Jörn Kreke from their service together on the board of Douglas Holding AG. Mr. Bierbaum advised Dr. Jörn Kreke of investment opportunities in Oppenheim-Esch real-estate funds.

9. Oppenheim's sales strategy to Kreke Im. emphasized that the Oppenheim-Esch funds were primarily designed for the personal investment purposes of Oppenheim partners and the families of its shareholders. According to Oppenheim and Mr. Bierbaum, it was only for tax reasons that a small portion of the Oppenheim-Esch funds were opened up to external investors. In other words, the funds were pitched as special investment products purportedly being offered to a select number of hand-picked clients of the bank. These representations proved to be materially false, as the funds were primarily marketed to and funded by Oppenheim's high net worth investment clients, with Oppenheim reaping excess profits through its fifty-percent interest

3

in the partnership with Josef Esch, which controlled the service providers charging high fees to the real-estate funds.

10. Oppenheim claimed that the underlying real-estate investments would consist solely of high-quality properties leased to long-term tenants with impeccable credit ratings. According to Oppenheim, this meant that any investment would be particularly safe. The investment strategy and risk profile described by Mr. Bierbaum and Oppenheim matched the conservative investment goals of Kreke Im. These representations also proved to be materially false.

11. Oppenheim sent Dr. Jörn Kreke documents for three different Oppenheim-Esch real-estate funds, emphasizing each time that the investments were being offered only to partners at the bank, its shareholders, and its closest clients. Kreke Im. eventually made the following capital contribution commitments to three such Oppenheim-Esch real-estate funds invested in commercial real estate projects, beginning in the years indicated:

| | | |
|---|---|---|
| A. | Köln-Ossendorf V GbR Fund (2000): | €6,451,075 |
| B. | Potsdam Brandenburger Straße GbR Fund 2001): | €5,711,937 |
| C. | Bürohäuser Köln Rheinhallen GbR Fund (2002): | €17,708,550 |
| | Total: | €29,871,562 |

12. In accordance with Oppenheim's investment model, Kreke Im.'s investments were significantly leveraged and its capital commitments initially financed by Oppenheim during the construction phase and at a later stage partially refinanced by other banks, including Sparkasse KölnBonn, the Cologne municipal savings bank. Kreke Im. has also received certain distributions over time. When the distributions are subtracted from Kreke Im.'s equity and interest payments made to date, Kreke Im. has paid approximately €8.1 million to date, and has massive outstanding loan commitments.

13. Kreke Im. eventually came to learn that the Oppenheim-Esch real-estate funds were fraudulently marketed. They have fees that result in an exorbitant cost structure and that are often not justified economically. The Oppenheim-Esch funds represented that rents were significantly higher than they really were because the tenants received undisclosed payments or allowances, and because rental areas were computed incorrectly. In addition, there were undisclosed self-dealing transactions between Oppenheim- and Esch-controlled entities, including kickback schemes.

14. For example, "soft costs" charged to investors (e.g., servicing fees not related to the cost of the property or construction) in the Oppenheim-Esch real-estate funds amount to 30-40% of the total investments in the funds. These fees far exceed market rates. Oppenheim failed to disclose that many of these costs were above market rates and not economically justified.

15. One of the reasons the soft costs reached such exorbitant levels was because Oppenheim and Esch falsely inflated those costs. For example, fund investors were charged considerable commissions for first-time leasing even when fund projects were planned from the outset for tenants that had already committed, so no first-time leasing fee should have been required. Fund investors were likewise charged fees for finance sourcing when finance partners were already available.

16. In addition, the services for which the funds were charged were invariably provided by Oppenheim- or Esch-controlled entities. Those entities then routed the fees to an Oppenheim-Esch partnership so that the bank, which was promoting and financing the investors, received half the fees.

17. The fees paid to Oppenheim from the Oppenheim-Esch partnership were so great that in some years they amounted to half the bank's profits.

18. In order to attract investors, Oppenheim also falsely represented or failed to disclose material facts concerning tenants and lease rates. Oppenheim represented that the

5

underlying real estate was already leased to reputable tenants under long-term leases with conditions that appeared to make the investment profitable in the projections Oppenheim presented to the investors, including Kreke Im. In order for these projections to show a profit, above-market rents were charged to the first tenants, creating an impression that it would be possible to maintain such rents even after the initial lease terms had expired.

19. Those initial above-market rents, however, were made possible by an improper scheme Oppenheim and Esch implemented with the first tenants. In short, Oppenheim and Esch used straw-man first tenants who agreed to above-market rents in exchange for kickbacks. Sparkasse KölnBonn, managed at the time by Gustav Adolf Schröder, was often a partner in these schemes, acting as de facto co-initiator and as interim tenant or rent guarantor for numerous Oppenheim-Esch fund properties.

20. Oppenheim further inflated its projections by inflating and misrepresenting the floor space used as a basis for calculating rents. Oppenheim would disclose to its investors, including Kreke Im., *gross* floor space, i.e., areas that included all internal walls, supply shafts and public roadways. The gross floor space was often 15 to 20% larger than the actual rentable space. Oppenheim did not disclose this non-standard calculation method, which served to further ensure that projected earnings did not match the market rates likely to be paid for the actual rentable space.

21. As a result of Oppenheim's fraudulent scheme, the Oppenheim-Esch funds in which Kreke Im. has invested have present values far less—from 35-70% less—than the amounts Oppenheim raised from investors like Kreke Im.

## PROCEEDINGS IN GERMANY

22. Kreke Im. commenced a formal mediation against Oppenheim in Germany on December 26, 2011, which terminated on January 10, 2013, without resolution.

23. Kreke Im. is in the process of commencing suit against Oppenheim and others in the District Court (Landgericht) of Cologne. Kreke Im. will assert claims for fraud, breach of duty, and breach of contract based on the facts set forth above.

## THE REQUIREMENTS OF SECTION 1782 ARE SATISFIED

24. This application satisfies the statutory requirements of Section 1782, which provides in relevant part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782.

25. To obtain discovery in aid of a foreign proceeding, a petitioner is required to show only that (1) the person from whom discovery is requested resides or is found in the district where the application is made; (2) the information sought is for use in a foreign proceeding; and (3) the petitioner is an interested person in that proceeding. There are also discretionary factors set forth by the United States Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) that courts are advised to consider.

26. All three necessary requirements are met here. First, Deutsche Bank AG does continuous and systematic investment banking business in New York City, where it maintains offices on Wall Street and is regularly a litigant in this District. Its website boasts that it "is the only investment bank physically located on Wall Street and one of the largest foreign-based employers in New York City."

27. Second, the limited information Kreke Im. seeks is for use in the civil lawsuit it is filing in Cologne, Germany, which constitutes a proceeding in a foreign tribunal.

28. Third, the application is made by an interested person; Kreke Im. will be the plaintiff in a German proceeding that is imminent.

7

29. Finally, for the reasons set forth in its accompanying Memorandum, *Intel Corp.*'s discretionary factors also favor granting this application.

30. For the reasons set forth above and in its accompanying Memorandum, Kreke Im. respectfully requests that it be authorized to serve on Deutsche Bank the discovery attached as Exhibits A and B to this Application.

Dated: March 26, 2013

Respectfully submitted,

FAEGRE BAKER DANIELS LLP

*/s/ Leif Simonson*

Leif T. Simonson (LS-5915)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
*Leif.simonson@faegrebd.com*

*Attorneys for Petitioner Kreke Immobilien KG*

dms.us.51748748.02